UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MATTHEW D. WOLF,

    *Plaintiff*,

    v.

DANIEL N. ALTMANN,

    *Defendant*.

Jury Trial Demanded

No. 4:22-cv-397

## COMPLAINT

1. Defendant Daniel Altmann has made demands and asserted legal claims upon plaintiff Matthew Wolf alleging that understandings they reached with respect to Botannis Labs Mo. Corp., Inc. ("Botannis"), a corporation in which they each have an ownership interest, as well as Wolf's duties as a director of Botannis, obligate Wolf, among other things, to perform work on behalf of and to fund business operations of Botannis. Wolf denies that he currently has or ever had any obligation to Daniel Altmann or to anyone to provide capital to, or to provide services on behalf of, Botannis. In order to obtain clarity as to whether he has any legal obligation to fund or to perform work on behalf of Botannis, Wolf respectfully submits this complaint against Daniel Altmann, seeking a declaration that he owes no such duties to Daniel Altmann, and states as follows:

## NATURE OF THE ACTION

2. This is a declaratory-judgment action brought under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Wolf seeks declaratory relief to clarify his legal relations with Daniel Altmann, who, claiming Wolf is obligated to capitalize and perform services

for Botannis, has threatened Wolf with legal action after Daniel Altmann refused to agree to terms that would have allowed the parties' former business venture to potentially go forward.

## PARTIES

3.	Plaintiff Matthew Wolf is a citizen of Colorado. He is an indirect minority shareholder in Botannis. Wolf is one of two directors of Botannis.

4.	Defendant Daniel Altmann is a citizen of Missouri who resides in St. Louis. He is a majority shareholder in Botannis. He is the other director of Botannis.

## JURISDICTION AND VENUE

5.	This court has subject-matter jurisdiction over this action, based on diversity, because Wolf and Daniel Altmann are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. 28 U.S.C. § 1332.

6.	This court has personal jurisdiction over Daniel Altmann because he is a Missouri citizen. According to public records, Daniel Altmann is a student at Saint Louis University School of Law and works in Earth City, Missouri. Daniel Altmann also transacted business within Missouri, including making contractual agreements within the state.

7.	Venue is proper in this district because Daniel Altmann resides in this district. 28 U.S.C. § 1391(b)(1); E.D. Mo. L.R. 2.07(B)(1). Venue is also proper in this district because a substantial part of the events or omissions giving rise to this claim occurred within this district. 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

I.	**In 2018, Missouri legalized medical marijuana and imposed various regulations, including a residency requirement for licensed businesses.**

8.	In 2018, Missouri voters approved an amendment to the Missouri Constitution to legalize medical marijuana in the state.

9. The amendment required medical-marijuana businesses to be majority owned by Missouri citizens:

> All medical marijuana cultivation facility, medical marijuana dispensary facility, and medical marijuana-infused products manufacturing facility licenses, entities with medical marijuana testing facility certifications, and entities with transportation certifications shall be held by entities that are majority owned by natural persons who have been citizens of the state of Missouri for at least one year prior to the application for such license or certification. Notwithstanding the foregoing, entities outside the state of Missouri may own a minority stake in such entities.

Mo. Const., art. XIV, § 1.7(3).

10. Following amendment, the Missouri Department of Health and Human Services (the "Department") created a regulatory regime to oversee the medical-marijuana industry.

11. Those regulations incorporated the constitutional residency requirement. 19 C.S.R. 30-95.040(3)(B) ("Cultivation, infused products manufacturing, dispensary, testing, and transportation facilities shall be held by entities that are majority owned by natural persons who have been citizens of the state of Missouri for at least one (1) year prior to applying for a facility license or certification.").

12. The regulations required a facility applying for a license to submit documents showing "the applicant is majority owned by Missouri residents" and submit proof of residency. 19 C.S.R. 30-95.025(4)(A)(2); 19 C.S.R. 30-95.040(2)(C).

**II. Wolf became a minority shareholder in Botannis, a Missouri corporation controlled by Daniel Altmann that successfully applied for a testing license.**

13. Wolf is a Colorado-based businessman with more than 20 years' experience in the contract nutraceutical and pharmaceutical product manufacturing industry. In recent years, his firm, Wolf Venture Capital Holdings, Inc., has focused on investments in the legal cannabis industry. It has developed substantial expertise in that area.

14. In June 2019, Wolf was exploring business opportunities in Missouri and was

introduced to Jeffrey Altmann.  Jeffrey Altmann, a lobbyist, runs his own lobbying firm, Viceroy Government Relations.

15. Jeffrey Altmann aggressively markets himself and his supposed influence on Missouri lawmakers and regulators.  "The simple truth is that I am a lobbyist," Altmann declared to *The Missouri Times* in an August 2017 article.

16. Wolf and Jeffrey Altmann discussed a potential partnership.  Those discussion contemplated the possibility of Wolf contributing his expertise to the venture, and Jeffrey Altmann being involved in order to satisfy the residency requirement for medical-marijuana businesses.  Jeffrey Altmann also claimed that he would utilize his self-professed familiarity with Missouri state government to help navigate the regulatory process incident to any legalized cannabis related business.

17. Ultimately, Jeffrey Altmann and Wolf decided to apply for a license for a testing laboratory in Missouri.  Wolf paid the costs and expenses associated with preparing the license application.

18. In preparing the license application, Wolf learned—for the first time—that Jeffrey Altmann had a criminal history.  In fact, Jeffrey Altmann's criminal history includes a felony domestic-violence charge, vandalism charges, and a raft of vehicular violations.

19. Missouri medical-marijuana facilities cannot be owned, in whole or in part, by an individual who has a disqualifying felony offense, which is defined by 19 C.S.R. 30-95.010(8).  In applying for a license, applicants must attest that the facility complies with this requirement.

20. By his own admission to Wolf, Jeffrey Altmann's criminal history disqualified him from obtaining a testing license under the state's license-application policies.

21. As a solution, Jeffrey Altmann proposed that his brother replace him on the

application.  At the time, Daniel Altmann had recently graduated from Missouri State University and was working in a support role at a personal-injury law firm in St. Louis.  He had no experience in the medical-marijuana industry.

22.     Wolf tentatively agreed to this substitution, at least for the purpose of applying for a testing laboratory in Missouri.  Mindful that he would be potentially contributing capital and expertise—while the recently graduated Daniel Altmann was contributing merely state residency—Wolf made clear that the parties would have to agree to protections reflecting Wolf's potential investment, were Botannis to obtain a license and the business to go forward.

23.     On July 25, 2019, Jeffrey Altmann, as sole incorporator, filed articles of incorporation for Botannis with the Missouri Secretary of State.  Ex. A.

24.     On August 8, 2019, Jeffrey Altmann executed a consent in lieu of meeting that, among other things, elected Wolf and Daniel Altmann as the only directors of Botannis.   Ex. B.

25.     By a subscription agreement dated August 8, 2019, Daniel Altmann subscribed to 5,100 shares of Botannis common stock, giving him a 51% ownership stake in the company.  Ex. C.

26.     Around that time, Botannis had bylaws in place.  Ex. D.

27.     With Botannis majority owned by a Missouri resident, it applied for a testing license.

28.     Botannis's license application provided, among other things, a visual representation of ownership:

**Figure 1**

### Botannis Labs Mo. Corp
### Ownership Visual Representation

| Owner(s) | Residency | Primary Profession | Subsidiary Entity Name | Tax | Individual % of Ownership Economic & Voting of Facility Applicant Holding Company | Subsidiary % of Interest in Holding Company Total of Individual Ownership % | % of Ownership of Individual in Subsidiary Entity |
|---|---|---|---|---|---|---|---|
| Daniel N. Altmann | MO | President | (MO Resident Owner) | | 51% | 51% | N/A |
| Matthew D. Wolf | CO | CEO | BLMO, LLC | | 43% | 43% | 100% |
| Nicholas S. Kingsbury | NY | Director | (Out of State Owners) | | 2% | 6% | N/A |
| Kevin H. Nguyen | NY | Director | | | 2% | | |
| Ann Costanza | NY | Director | | | 2% | | |
| **Total** | | | | | **100%** | **100%** | |

29. In connection with the license application, Botannis provided evidence of adequate capitalization.

30. Wolf attested that Botannis had access to adequate capital, making a "***revocable*** pledge of $400,000.00 to BOTANNIS LABS MO CORP. for the purposes of successfully carrying out the activities described in its application." Ex. E (emphasis added).

31. The revocable pledge of $400,000 in capital exceeded the minimum required under Missouri law and regulations.

32. In December 2019, Botannis received a testing license from the state. The license stated that Botannis:

> is hereby granted a certificate to conduct laboratory testing of medical marijuana at the above named location in accordance with Article XIV of the Missouri Constitution and the rules promulgated thereunder, subject to all the provisions thereof and to the regulations of the Missouri Department of Health & Senior Services, medical marijuana regulatory program.
>
> This license is issued for the period ending 12/19/2020.

6

Ex. F.

33. Missouri regulations provide that: "The issuance of a facility license or certification does not authorize the facility to begin cultivating, manufacturing, dispensing, testing, or transporting medical marijuana. A facility will be granted final approval to operate upon passing a commencement inspection." 19 C.S.R. 30-95.040(1)(C).

34. Wolf confirmed acceptance of Botannis's license. The confirmation acknowledged that: "The issuance of a license or certification does not authorize the facility to begin operations. A facility will be granted final approval to operate upon passing a commencement inspection." Ex. G. The confirmation also acknowledged that: "If the facility does not pass a commencement inspection within one (1) year of the department issuing the license, the license may be revoked." *Id*.

35. Obtaining a license did not mean that Botannis could immediately begin operations as a testing facility. To the contrary, the license was provisional, as it required Botannis to pass a commencement inspection.

36. Even had it passed the commencement inspection, there was no guarantee that Botannis would generate revenue or become a profitable testing facility. Among other things, Botannis would have to comply with all relevant regulations and laws (local, state, and federal); hire employees and specialists qualified to work in a testing facility; navigate a novel and emerging sector of the state economy; secure a customer base in an area of the state well outside of the two major metropolitan centers; and take many other steps necessary to operate as a successful going concern.

**III.    After Botannis received the license, Wolf tried for months to finalize an agreement to protect his investment, but Daniel Altmann refused to agree to those safeguards.**

37. As of the time in December 2019 that Missouri issued Botannis a license to conduct

laboratory testing of medical marijuana, neither Wolf nor defendant Altmann had executed any shareholder agreement or other agreement memorializing the rights and obligations of the shareholders of Botannis.

38.   Accordingly, with Botannis having received a provisional license, Wolf and Daniel Altmann turned their attention to negotiating the relevant terms that would govern their rights and obligations as shareholders of Botannis.

39.   On December 18, 2019, attorneys with the law firm Vicente Sederberg sent proposed start-up documents for Botannis to Daniel Altmann and Wolf, among other minority shareholders. The draft documents included a consent of the board of directors; amended and restated bylaws; a shareholder agreement; an option agreement; and signature packets.

40.   The draft documents reflected the understanding from the first business discussions between Wolf and Jeffrey Altmann (before Jeffrey Altmann revealed that he could not participate in Botannis because his criminal background would disqualify it from receiving a license to operate a testing laboratory in Missouri): Wolf could go forward with an investment in Botannis only if the value of his investment and intellectual property was protected under the parties' legal agreements.

41.   A draft option agreement memorialized one of those protections, which provided—in the event that Missouri no longer imposed a residency requirement on Botannis and similar businesses—another corporate entity owned by Wolf could purchase Daniel Altmann's shares at a generous exercise price.

42.   Daniel Altmann did not agree to the deal terms, including the option agreement, in the weeks following transmission of that document package.

43.   From January 6 to January 14, 2020, Vicente Sederberg attorneys sent follow-up

emails to Daniel Altmann to inquire whether the deal terms reflected in the proposed agreements were acceptable to him.

44. On January 16, 2020, Daniel Altmann finally responded. Daniel Altmann stated that he was or had been on vacation, but assured the group that he would sign the documents that following weekend.

45. Daniel Altmann never returned the signed documents over the weekend despite promising to do so.

46. On January 27, 2020, after Vicente Sederberg attorneys again inquired about the status of the documents, Daniel Altmann said that he had been sick after he returned from vacation, but pledged to sign the documents by the end of the week.

47. On January 28, 2020, Wolf emailed Daniel Altmann, stating: "Let's try to get this agreement wrapped up, so we can move forward. Give it a good read, with an attorney, and make sure it reflects your full understanding of everything we discussed and agreed to."

48. On January 31, 2020, Daniel Altmann responded, about the documents, that: "I have read [them] and feel optimistic," but that he wanted his attorney to review them on February 7, 2020. Daniel Altmann's email concluded by stating that he was: "Looking forward to wrapping this up, and moving forward as a cohesive team."

49. On February 4, 2020, Jeffrey Altmann emailed an attorney at Vicente Sederberg, stating: "My brother won't be signing anything you have provided, and I think you know why. Nice try, but no thanks. In the future, as previously communicated, please keep me in the loop on these matters. Matt, Please call me when you have a chance. Very disappointed, and hoping this was a miscommunication we can fix."

50. Surprised, Wolf spoke with Jeffrey Altmann. Based upon that conversation, minor

9

changes were made to the proposed shareholder agreement and board consent.

51. On February 27, 2020, Wolf sent those revised documents to the Altmanns. Jeffrey Altmann promised to review the documents that night and discuss the documents that weekend.

52. On March 17, 2020, Wolf again reached out to Jeffrey Altmann, asking if Daniel Altmann intended to sign the relevant documents and move forward with Botannis.

53. By March 26, 2020, the Altmanns had not responded and Daniel Altmann still had not signed the documents, even though they included revisions that the parties had discussed.

**IV.   After the Altmanns' months-long refusal to agree to the deal terms, Wolf moved on from the venture, leading the Altmanns to resurface and threaten suit.**

54. By the end of March 2020, and after months of non-cooperation from the Altmanns, Wolf concluded that it would be futile for him to spend more time, effort, and money on trying to start up the venture. Despite having incurred significant costs in attempting to start up Botannis, Wolf—well aware that inchoate business ventures sometimes do not work out—believed that to be the end of his involvement in Botannis.

55. At that time, Wolf explored plans to sell his stake in Botannis. Missouri regulations, however, restricted the ability of owners of medical-marijuana businesses to transfer their licenses.

56. Among other things, Missouri regulations provide that: "All licensed or certified cultivation, dispensary, manufacturing, testing, and transportation facilities must seek and obtain the department's approval before they may … [m]ake any changes to ten percent (10%) or more of the ownership interests of the facility." 19 CSR 30-95.040(4)(C).

57. From April 2020 to early 2021, Wolf communicated infrequently with the Altmanns.

58. In July 2020, Wolf responded to an email from someone affiliated with the Missouri

10

Medical Cannabis Trade Association by copying the Altmanns, explaining that they "are majority shareholders and managing the business," but Wolf was "not currently active" in the state.

59.  On August 3, 2020, Jeffrey Altmann emailed Wolf, stating: "I need your thoughts to see where you want to go from here and either set up and run the best lab in Missouri, or collapse into nothing and litigation."

60.  On February 9, 2021, almost a year after the revised deal documents were sent to the Altmanns, Jeffrey Altmann abruptly resumed interest in Botannis.  In an email to Wolf and others, Jeffrey Altmann stated that he was reviewing the shareholders agreement (i.e., the draft that Wolf provided to the Altmanns almost a year earlier) with his attorney.  Jeffrey Altmann promised to return a marked-up version of the shareholders agreement the following day.

61.  More than a week later, on February 17, 2021, Jeffrey Altmann emailed Wolf and others marked-up versions of the shareholders agreement and bylaws.

62.  On March 2, 2021, the Department revoked Botannis's license.

63.  Contemporaneous news reports indicated that the Department also revoked the licenses of other businesses that had not passed a commencement inspection within a set time frame.  Those reports indicated that, in early 2021, the Department revoked or deactivated the licenses of approximately 29 lawful marijuana businesses.

64.  On March 19, 2021, Jeffrey Altmann asked Wolf for his view on whether Botannis should appeal the Department's revocation of Botannis's testing license.  Jeffrey Altmann also touted (as he had done before) testing opportunities for Kratom, an herbal extract that can cause opiate-like effects.  The Mayo Clinic has described Kratom as unsafe and ineffective.

65.  On March 28, 2021, Wolf responded.  Wolf explained that he lacked the "time and resources to work on this personally," but suggested that he sell his share to a third-party operator

11

and "help [Jeffrey Altmann] get started."

66. Wolf was not interested in moving forward with the venture because nothing had changed since Daniel Altmann refused to agree, or even to propose revisions, to the deal documents that would protect Wolf's intellectual property. Wolf also lacked confidence in the Altmanns after what had taken place, including (among other things) Jeffrey Altmann's initial failure to disclose his significant criminal history and Daniel Altmann's months-long refusal to engage about routine deal terms that would protect Wolf's investment and intellectual property.

67. There was little communication between the parties over the next year.

68. On March 18, 2022, counsel for the Altmanns sent a demand letter to Wolf with a proposed draft complaint. In the draft complaint, Daniel Altmann threatened to bring two claims against Wolf, alleging that Wolf breached a supposed fiduciary duty to Daniel Altmann, was liable for fraud, and had and continues to have obligations to fund Botannis and, as a current director, if not also otherwise, to perform services on its behalf.

69. The draft complaint theorized, for both claims, that Wolf was somehow obligated to capitalize Botannis and perform work for the company even though Daniel Altmann refused to agree to deal terms that would govern the parties' business rights and responsibilities.

70. Beyond claims that Wolf has had continuing obligations to defendant Altmann with respect to Botannis, the demand letter sent by counsel for the Altmanns claimed damages of "at least several million dollars."

71. The draft complaint claimed that on July 20, 2019, "Wolf agreed to fund $1,000,000 in three separate batches."

72. That allegation is based on an email sent from Wolf to Jeffrey Altmann on July 20, 2019. Ex. H.

73. The July 20, 2019 email prefaced those figures by stating, "For discussion."

74. The July 20, 2019 email included an assumption that Jeffrey Altmann would be the majority owner of the company, stating: "51% Jeffrey Altmann, President." It also assumed that Wolf would own a 49% share in the company.

75. When Botannis was later formed, Jeffrey Altmann did not own any share in the company, and Wolf did not own 49% of the company.

76. The July 20, 2019 email involved estimates of other potential financial metrics. These included revenues and various expenses, including for employees that Botannis never hired.

77. The July 20, 2019 email concluded by stating: "Our goal is a break-even business supporting important infrastructure and payroll."

78. No written agreements to which Daniel Altmann is a party impose on Wolf any obligation to provide funds to or to perform services on behalf of Botannis.

## CLAIMS FOR RELIEF

### Count One: Declaratory Relief Under 28 U.S.C. §§ 2201, 2202

79. Wolf realleges and incorporates paragraphs 1 through 78 of his complaint as if fully set forth and restated herein.

80. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. " 28 U.S.C. § 2201.

81. This Court has jurisdiction over this matter.

82. This case presents an actual case and controversy that is immediate and justiciable. The dispute between the parties is real, substantial, definite, and concrete, implicating the legal

relations of parties with adverse legal interests.

83. The requested declaratory judgment will serve a useful purpose in clarifying and settling the legal relations between the parties.

84. The declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.

85. No other proceeding involving these issues and parties exists.

86. Daniel Altmann has contended that Wolf owes Daniel Altmann a duty to fund Botannis, to perform work on behalf of Botannis, and to provide marijuana-testing equipment to Botannis. Daniel Altmann has threatened Wolf with litigation based upon this claim.

87. Wolf disputes that he owes Daniel Altmann a duty to fund Botannis, to perform work on behalf of Botannis, and to provide marijuana-testing equipment to Botannis.

88. Wolf is entitled to a declaration that he has no obligation to provide funding or equipment to Botannis and that he has no obligation to perform services on behalf of Botannis.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 2.04, Wolf hereby demands a jury trial on all issues so triable.

## **REQUEST FOR RELIEF**

For the foregoing reasons, Wolf respectfully requests that the Court enter judgment in his favor and award the following relief:

Enter an order providing for the requested declaratory relief;

Award Wolf his reasonable costs and attorneys' fees;

Grant Wolf's request for a trial by jury on all jury-triable issues;

Grant Wolf any other relief as this Court deems necessary, just, and proper.

April 4, 2022						Respectfully submitted,

					*s/ Zachary R. Lazar*
					Charles L. Solomont (admission pending)
					  carl.solomont@morganlewis.com
					  557190(MA)
					Andrew M. Buttaro (admission pending)
					  andrew.buttaro@morganlewis.com
					  684499(MA)
					**MORGAN, LEWIS & BOCKIUS LLP**
					One Federal Street
					Boston, Massachusetts 02110-1726
					Tel.: (617) 341-7700
					Fax: (617) 341-7701

					Zachary R. Lazar
					  zachary.lazar@morganlewis.com
					  6325727(IL)
					**MORGAN, LEWIS & BOCKIUS LLP**
					110 North Wacker Drive
					Chicago, IL 60606-1511
					Tel.: (312) 324-1000
					Fax: (312) 324-1001

					*Counsel for Plaintiff Matthew D. Wolf*