## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW D. WOLF, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 4:22-CV-397 PLC |
| | ) | |
| DANIEL ALTMANN, | ) | |
| | ) | |
| Defendant/Counter-Claimant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOTANNIS LABS MO. CORP. INC., | ) | |
| | ) | |
| Counter-Claimant. | ) | |

## <u>MEMORANDUM AND ORDER</u>

Matthew Wolf, an indirect minority shareholder of Counter-Claimant Botannis Labs Mo. Corp. Inc. (Botannis) filed a complaint against Defendant/Counter-Claimant Daniel Altmann (Altmann) seeking a declaratory judgment clarifying his legal obligations to fund the business operations and perform work on behalf of Botannis. [ECF No. 1] Altmann and Botannis filed a counterclaim against Wolf, alleging breach of fiduciary and fraud. [ECF No. 21]

Wolf moved to dismiss the counterclaim. [ECF No. 31] In response to Wolf's motion to dismiss, Altmann and Botannis filed a three-count first amended counterclaim asserting breach of fiduciary duty, fraud, and negligent misrepresentation. [ECF No. 35] Wolf thereafter filed (1) a motion to dismiss Altmann's claims in the first amended counterclaim pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6), and 23.1 and (2) a motion to stay discovery pending adjudication of Altmann's counterclaims. [ECF No. 37, 43]  The Court considers below Wolf's motions to dismiss and motion to stay discovery.

I.      **Background**[1]

Wolf is a Colorado-based businessman with experience in the legal cannabis industry. [ECF No. 1 at ¶ 13] After Missouri voters approved an amendment to the Missouri Constitution legalizing medical marijuana in the state, Wolf sought business opportunities in Missouri. [Id. at ¶ 8]  Missouri, however, requires medical-marijuana businesses to be majority-owned by Missouri citizens. [Id. at ¶ 9] Wolf was introduced to Jeffrey Altmann (Jeffrey) and they discussed opening a medical-marijuana business in Missouri, with Wolf "contributing his expertise to the venture" and Jeffrey satisfying the residency requirement and navigating the regulatory process.  [Id. at ¶¶ 14, 16]  Wolf and Jeffrey agreed to apply for a license for a testing laboratory in Missouri. [Id. at ¶ 17, ECF No. 35 at ¶ 19]

In the amended counterclaim, Altmann alleges that on July 20, 2019, Wolf made a $1,000,000 written commitment to fund the business, specifically promising: "Funding Commitment: $200k at close[,] $300k at licensing, and $500k at first revenue."[2] [ECF No. 35, ¶¶

---

[1]  In assessing the adequacy of a complaint under Rule 12(b)(6), the Court generally ignores materials outside of the pleadings. Ashford v. Douglas Cty., 880 F.3d 990, 992 (8th Cir. 2018). The Court, however, may consider materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. Id.

[2] Altmann does not state the source of this written commitment and did not attach a copy of the document to the first amended counterclaim. Wolf, however, alleged in his complaint that he sent an email to Jeffrey on July 20, 2019, and attached the purported email to his complaint. [ECF No. 1 at ¶¶ 71-77] This documents states, in relevant part:

> Jeff,
> For discussion.
> Botannis Labs MO Corp.
> 51% Jeffrey Altmann, President
> 49% Matt Wolf, CEO
>
> Funding Commitment:
> $200k at close
> $300k at licensing
> $500k at first revenue

The email then sets forth a list of items and services with amounts and states:

2

22-23] Altmann alleges Wolf did not state that the funding commitment was speculative or contingent on any future event provided that the company obtained a testing license.  [ECF No. 35 at ¶ 26] On July 25, 2019, Jeffery filed Articles of Incorporation with the Missouri Secretary of State formally incorporating the company, Botannis. [ECF No. 35 at ¶ 29, ECF No. 1 at ¶ 23, ECF No. 35-11]

On July 29, 2019, Jeffrey and Wolf decided that Altmann would replace Jeffrey "as an owner in Botannis due to uncertainty surrounding Jeffrey's eligibility [to obtain a marijuana testing license] under state law." [ECF No. 1 at ¶ 21, ECF No. 35 at ¶ 30]  Altmann alleges that he "agreed to be an owner in Botannis based on representations made by Wolf regarding his funding commitments, revenue forecasts, business acumen, and Wolf's general expertise in the marijuana industry." [ECF No. 35 at ¶ 32]

During a meeting in July 2019, Altmann agreed to be President of Botannis and Jeffery, on Altmann's behalf, agreed to obtain the testing license, ensure compliance with state laws and regulations, and to procure "clients." [ECF No. 35 at ¶ 35]  Altmann alleges that, during this meeting, Wolf agreed to: (1) "the Funding Commitment" "if they obtained a license because that amount of money was needed to get Botannis up and running[;]" (2) provide the knowledge necessary to conduct the testing permitted under the license; and (3) provide "hundreds of thousands of dollars" in necessary "testing equipment" through his "procurement department[.]" [ECF No. 35 at ¶ 35]

---

Revenue ~$1M

COGS $500k
SGA $500k

Our goal is a break-even business supporting important infrastructure and payroll.

[ECF No. 1-1, Ex. H]

In August 2019, Jeffrey executed a "consent in lieu of meeting of sole incorporator" in which he adopted bylaws for Botannis;[3] fixed the number of corporate directors at two; elected Wolf and Altmann as the directors; and resigned as the sole incorporator. [ECF No. 35-2] Ultimately, Altmann acquired 51% ownership interest in Botannis; BLMO, Inc., an organization wholly owned by Wolf, acquired 43% ownership; and three New York residents, Nicholas Kingsbury, Kevin Nguyen, and Ann Costanza, each acquired 2% ownership.[4] [ECF No. 1 at ¶¶ 23, 28; ECF No. 35 at ¶ 39] Altmann alleges, on information and belief, that Kingsbury, Nguyen, and Costanza "are social acquaintances or colleagues of Wolf and work with Wolf[.]" [ECF No. 35 at ¶ 59]

On August 17, 2019, Botannis applied for a marijuana testing license with Missouri. [ECF No. 1 at ¶ 28; ECF No. 35 at ¶ 48] Because the license application required Botannis to provide evidence of adequate capitalization, Botannis' application included a statement that "Our Testing Facility team has $400,000.00 in liquid capital deposited with financial institutions under the name of Owner/CEO Matthew D. Wolf, …that has been pledged to the Botannis Testing Facility[.]" [ECF No. 1 at ¶ 29; ECF No. 35-6] Attached to the application was a bank account statement in Wolf's name, and Wolf's August 16, 2019 affidavit averring and "acknowledging my grant of a revocable pledge of $400,000.00 to Botannis Labs Mo Corp. for the purposes of successfully carrying out the activities described in the application." [ECF No. 35-6]

Altmann alleges Wolf "explained to [Altmann] and Jeffrey that [the $400,000 'revocable' pledge] simply meant that if Botannis did not receive a license Wolf would take back the $400,000[.]" [ECF No. 35 at ¶ 63] Altmann also alleges that "Wolf submitted a five (5) year annual profit and [loss] forecast" under which Wolf estimated annual "gross profits" ranging from

---

[3] Altmann attached a copy of the August 8, 2019 bylaws to the amended counterclaim. [ECF No. 35-3]

[4] Botannis issued 10,000 shares of common stock. [ECF No. 1-1, ex. A] Altmann paid $51 for 5,100 shares or $.01 per share [ECF No. 35-1]

approximately $300,000 to $2.7 million between the years 2020 and 2024, for a total of $7,673,937 in "gross profits" during this period.  [ECF No. 35 at ¶ 64-65, ECF No. 35-7]

Altmann asserts that on August 20, 2019, Wolf, Altmann, and Jeffrey conducted another meeting at which "Wolf discussed everything that was ultimately represented to the State of Missouri in the license application" and "represented that he wanted to start on a build out for the Botannis facility" and to explore expanding to other states. [ECF No. 35 at ¶ 49-50] Altmann claims Wolf stated that "'the big payoff' would come five to ten years 'down the road' when they sold Botannis for 'ten times EBITDA.'"[5] [ECF No. 35 at ¶ 52]

In December 2019, Missouri issued Botannis a testing license and Wolf executed a "Confirmation of Acceptance" of the license on Botannis' behalf. [ECF No.  1 at ¶ 33-35; ECF No. 35 at ¶ ¶ 67-68, ECF No. 35-8] Before commencing operations, Botannis was required to pass a "commencement inspection[.]" [ECF No. 1 at ¶ 33-35, ECF No. 35-8]  Botannis had one year to pass the "commencement inspection" or risk having its license revoked. [ECF No. 1 at ¶ 34, ECF No. 35-8]

Altmann alleges that Wolf's behavior "changed dramatically in 2020" and that on February 4, 2020, Wolf's counsel "attempted to force, trick, or pressure [Altmann] into signing a host of documents, including an 'option agreement' and amended bylaws for Botannis." [ECF No. 35 at ¶ 71]  Altmann states he "was never made aware of the contents of the proposed documents [] nor was [he] apprised that Wolf would insist on the dramatic changes to Botannis[.]" [ECF No. 35 at ¶ 72] Altmann alleges that the "option agreement" would have given Wolf a 15-year option to purchase some or all of Altmann's shares in the event Missouri law changed to allow out-of-state owners to

_____

[5] Altmann does not define EBITDA but typically it stands for "earnings before interest, taxes, and depreciation" which is defined as a "company's income without deductions for interest expenses, taxes, depreciation expenses, or amortization expenses, used as an indicator of a company's profitability and ability to service its debt." Black's Law Dictionary (11th ed. 2019).

be majority owners of a Missouri marijuana license. [ECF No. 35 at ¶ 73] Altmann further alleges

that:

> [Payment of the $1,000 option price to Altmann] included a complete overhaul of the By-laws in Wolf's favor. And in the same vein, Wolf's brother would also be added as a Director – meaning that [Altmann's] vote as a Director was effectively meaningless under the By-Laws, as only two directors needed to agree.
> In short, signing the Option Agreement would guarantee that (a) [Altmann] would lose control of Botannis immediately; and (b) the income from and value of his shares would plummet to a mere fraction of their value if Missouri law changed – as he could be completely bought out under the Option Price or Wolf could buy the requisite shares necessary to gain sufficient control to unilaterally amend the By-Laws thereby rending [Altmann's] shares effectively worthless.

[ECF No. 35, ¶¶ 73-74][6]

Altmann alleges "[i]t was always Wolf's intention to condition all of his promises to

[Altmann] on [Altmann's] execution of the Option Agreement" and that Wolf either deliberately or

negligently failed to disclose this requirement to Altmann. [ECF No. 35, ¶ 76] In support, Altmann

notes that the draft documents sent to him on February 4, 2020, were dated December 18, 2019, the

day before Wolf executed the confirmation of acceptance of the testing license. [ECF No. 35 at ¶

75] Altmann alleges Wolf "refused to carry out his director duties or perform any of his promises

and representations" unless the documents were executed and Wolf was given "complete control"

over Botannis. [ECF No. 35 at ¶¶77-80]  Botannis' testing license was subsequently revoked by the

State of Missouri and Altmann alleges, on information and belief, that Wolf "removed all of the

---

[6] The amended counterclaim suggests that the "option agreement" Altmann received on February 4, 2020 contains provisions expanding the size of the board of directors; naming Wolf's brother, Mark Wolf, as a Director; and amending the bylaws. The amended counterclaim alleges that the draft documents received by Altmann on February 4, 2020 were dated December 18, 2019, and these documents are attached as an exhibit to the pleading. [ECF No. 35-9]

Based on the content of the documents presented, it appears that the amended bylaws were not incorporated into the "option agreement" but instead were attached to a document entitled "Unanimous Written Consent in Lieu of First Meeting of Board of Directors." It is this document, and not the "option agreement," that also would have increased the size of the board of directors and named Wolf's brother as the third director.

funding he had allocated for Botannis and moved it to operations in different states. Further, he diverted testing equipment that would and should have been used in Missouri to other states." [ECF No. 35 at ¶¶ 81-82]

On March 18, 2022, Altmann sent Wolf a letter "demanding corrective action" in which Altmann attempted "to obtain the desired action from Wolf – e.g., perform his director duties." [ECF No. 35 at  ¶¶ 85] After receiving the demand letter, and an attached draft complaint asserting claims against him, Wolf filed this declaratory judgment action against Altmann seeking to clarify his legal obligations to Altmann and Botannis. [ECF No. 1 at ¶ 1] Altmann filed his answer and a counterclaim which joined Botannis as a counter-claimant and alleged claims of breach of fiduciary duty and fraud against Wolf. [ECF No. 21] Wolf filed a motion to dismiss the counterclaim. [ECF No. 31]

In response to Wolf's motion to dismiss, Botannis and Altmann filed a first amended counterclaim. [ECF No. 35] In Count I, Botannis and Altmann, individually and derivatively on behalf of Botannis, claim breach of fiduciary duty against Wolf as a corporate director of Botannis. [ECF No. 35, ¶¶ 89-108] In Counts II and III, Altmann individually asserts claims of fraud and negligent misrepresentation against Wolf. [ECF No. 35 ¶¶ 109-130]

Wolf subsequently filed a motion to stay discovery pending adjudication of the counterclaims. [ECF NO. 37]  Specifically, Wolf seeks to stay Altmann's requests for written discovery until the Court has adjudicated Wolf's motion to dismiss the first amended counterclaim[7] or, in the alternative, a 30-day extension to respond to Altmann's discovery requests. [ECF No. 37]

Subsequently, Wolf filed a "Motion to Dismiss the First Amended Counterclaim" requesting the Court dismiss, with prejudice and without leave to amend, all of the claims in the first amended counterclaim. [ECF NO. 43] Although Wolf's motion seeks dismissal of the claims contained in the

---

[7] Although Wolf's motion seeks to stay discovery pending adjudication of his motion to dismiss the first amended counterclaim, Wolf's motion to stay pre-dated the relevant motion to dismiss by nine days.

first amended counterclaim, Wolf's memorandum in support of the motion does not challenge Botannis' claim for breach of fiduciary duty. [ECF No. 44]  Instead, Wolf argues the Court should dismiss each of Altmann's claims for failing to state a claim under Federal Rule of Civil Procedure 12(b)(6) and lack of particularity as required by Rule 9(b).  [ECF No. 44]  Wolf further asserts Altmann fails to satisfy Rule 23.1's requirements for bringing a derivative action in Count I. [Id.]

## II.    Legal Standards

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of a complaint. Fed. R. Civ. P. 12(b)(b). The federal rules do not require detailed statements of fact in the complaint, instead requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512–13 (2002) (the federal court is a notice pleading system). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2006)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When considering a motion to dismiss for failure to state a claim, a court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Cole v. Homier Distrib. Co., Inc., 599 F.3d 856, 861 (8th Cir. 2010) (quoting Coons v. Mineta, 410 F.3d 1036, 1039 (8th Cir. 2005)).

If a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 355 (8th Cir. 2011). Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. Iqbal, 556 U.S. at 678. Although courts must accept

all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. Twombly, 550 U.S. at 555 (internal quotations and citation omitted).

**III.    Discussion**

A.  Motion to Dismiss the Counterclaim

After Altmann filed his answer and original counterclaim joining Botannis, Wolf filed a motion to dismiss Altmann's claims in the counterclaim. [ECF No. 31] Altmann did not file a response to Wolf's motion but instead he and Botannis filed the first amended counterclaim. [ECF No. 35] Because the first amended counterclaim supersedes the original, Wolf's pending motion to dismiss the original counterclaim is denied as moot. See In re Wireless Tel. Fed. Cost Recovery Fees Litig., 396 F.3d 922, 928 (8th Cir. 2005) (an amended complaint supersedes an original complaint, rendering it without legal effect).

B.  Motion to Dismiss the First Amended Counterclaim

1.   Count I – Botannis' Breach of Fiduciary Duty Claim

In Count I of the first amended counterclaim, Botannis and Altmann each bring claims of breach of fiduciary duty against Wolf as a corporate director of Botannis. [ECF No. 35, ¶¶ 89-108] Wolf's motion to dismiss seeks dismissal of the amended counter-complaint and "all the claims that it contains." [ECF No 43] Wolf's memorandum in support of the motion, however, does not address Botannis' breach of fiduciary duty claim. Because Wolf's memorandum contains no discussion of Botannis' claim, Wolf's motion to dismiss this claim will be denied without prejudice. See Eastern District of Missouri, Local Rule 4.01 (A) ("Unless otherwise directed by the Court, the moving party must file with each motion a memorandum in support of the motion, including any relevant argument and citations to any authorities on which the party relies); Mayo v. Christian Hosp. Northeast-Northwest, No. 4:97-CV-28 SNL, 962 F. Supp. 1203, 1204, n.2 (E.D. Mo. May 2, 1997) (the court

may deny a party's motion for failing to comply with Local Rule 4.01(A) which requires a party to file a memorandum of law in support with citations to relevant caselaw.

### 2.  Count I – Altmann's Derivative Breach of Fiduciary Duty Claim

In Count I, Altmann, both individually and derivatively on behalf of Botannis, asserts claims of breach of fiduciary duty against Wolf as a corporate director of Botannis.[8]  [ECF No. 35, ¶¶ 89-108] While the Court addresses these claims separately, starting with Altmann's derivative claim, the factual allegations common to both claims are as follows:

In addition to incorporating all other paragraphs of the counter-complaint, Altmann asserts in Count I that Wolf has been a director of Botannis since July 2019 and that, as a corporate director, he owes a fiduciary duty to the corporation and its shareholders. [ECF No. 35, ¶ 90-91] Altmann alleges Wolf breached his fiduciary duties to Botannis and Altman by:

(a) [r]efusing to follow through with his representations of funding Botannis;

(b) [i]nsisting that [Altmann] sign unfavorable documents that were actually personally favorable to Wolf;

(c) [r]efusing to perform any work on behalf of Botannis after February 2020 when [Altmann] refused to sign Wolf's deal;

(d) [d]iverting marijuana testing equipment that could have been used in Missouri to other marijuana enterprises in which Wolf has an interest;

---

[8] In the motion to dismiss, Wolf argues that the first amended counterclaim "equivocates as to whether [Altmann's] fiduciary-duty claim is brought individually or derivatively" but asserts that Altmann's claim can only be brought derivatively. [ECF No. 44, at 16-17]  Altmann's only response on this issue is to assert that a "shareholder may sue individually if there is an individual injury separate from any injury the stockholder sustains." [ECF No. 49, at 3]

In Count I, Altmann asserts he is bringing the breach of fiduciary claim "individually and derivatively on behalf of Botannis" "to the extent necessary[.]" [ECF No. 35, ¶ 102]  Altmann also alleges that "[b]oth [Altmann] and Botannis have been damaged as a direct and proximate result of Wolf's actions, error, and omissions in the form of future lost profits and opportunities and attorney's fees[.]"  [ECF No. 35 , ¶¶ 95-97] Based on these allegations, the Court finds that Altmann is attempting to assert both a derivative and an individual breach-of-fiduciary claim against Wolf as a director of Botannis in Count I of the first amended counterclaim.

(e) [r]efusing and failing to disclose that he needed and wanted full control of Botannis;

(f) [p]ermitting Botannis' marijuana testing license to be revoked by Missouri through deliberate inaction and failure to follow through on the representations he made in the license application;

(g) [f]ailing to appeal or contest the license revocation; and

(h) [o]therwise failing to take any steps whatsoever to further Botannis' interest, finances, or standing after March 2020.

[ECF No. 35 ¶ 92]

Altmann contends he has been unable to conduct any business on behalf of Botannis as one of its two directors due to Wolf's conduct as the other named director. Altmann alleges Wolf forecasted $7,673,937 in "gross profits" for Botannis between 2020 and 2024, and that this sum represents "future lost profits that would have been paid to Botannis" and that Altmann "personally has a proportional interest in these sums which could have been distributed to him as a shareholder of Botannis."[9] [ECF No. 35, ¶ 96-97] Altmann asserts both he and Botannis "have been damaged as a direct and proximate result of Wolf's actions, errors, and omissions in the form of future lost profits and opportunities and attorney's fees." [ECF No. 35, ¶ 95] Altmann alleges he sustained these damages "individually and/or derivatively[.]" [ECF No 35, ¶ 108]

---

[9] While Altmann's allegations regarding the "gross profit" figures presented in the "Annual Profit & Loss Forecast" drafted by Wolf are technically correct, the Court observes that Altmann's allegations suggesting this figure represents "lost profits" available for distribution to the shareholders appears to be inaccurate. "Gross profit" is defined as "[t]otal sales revenue less the cost of the goods sold, no adjustment being made for additional expenses and taxes." Black's Law Dictionary (11th ed. 2019).  This is distinguishable from "net profit" which is defined as the "[t]otal sales revenue less the cost of the goods sold *and all additional expenses*." Black's Law Dictionary (11th ed. 2019) (emphasis added). Indeed, review of the attached document suggests that the "gross profit" figure represents the "net revenue" minus the "cost of goods sold[,]" and does not necessarily reflect consideration of the corporation's operating costs or the corporation's "net profit."

In the motion, Wolf argues Altmann's derivative breach of fiduciary claim must be dismissed because Altmann has failed to meet the heightened pleading requirement of Rule 9(b), to satisfy the requirements of Rule 23.1 governing derivative actions, and to state a claim under Rule 12(b).

> a. Rule 9(b)'s Heightened Pleading Requirement/Altmann's Derivative Breach of Fiduciary Duty Claim (Count I)

The parties agree that Altmann's fraud and negligent misrepresentation claims (Counts II and III) must meet the heightened pleading requirement of Rule 9(b) to withstand a motion to dismiss but disagree on extending a similar requirement to Altmann's breach of fiduciary duty claim. Wolf contends Altmann's breach of fiduciary duty claim is "grounded in fraud" because it "incorporate[s] all other paragraphs" of the counterclaim, including those related to Altmann's fraud and negligent misrepresentation claims, and therefore must be plead with particularity.  Altmann counters that incorporation of other paragraphs of the counterclaim into his breach of fiduciary claim does not "ground" the claim in fraud. [ECF NO. 49, at 2] Altmann argues the heightened pleading requirement of Rule 9(b) only applies to "particular averments of fraud" within his breach of fiduciary duty claim because fraud is not an essential element of the claim. [ECF No. 49 at 3] Altmann argues that he has satisfied this burden and, alternatively, that his claim as a whole satisfies the rule's heightened pleading requirement. [ECF No. 49 at 3]

Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Because one of the main purposes of the rule is to facilitate a defendant's ability to respond and to prepare a defense to charges of fraud, conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Commercial Property Investments, Inc. v. Quality Inns Int'l, 61 F.3d 639, 644 (8th Cir. 1995) (internal citations omitted). Under Rule 9(b), a plaintiff must plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." BJC Health Sys. v.

12

Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007) (quoting Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001)). The party must identify the "who, what, where, when, and how" of the alleged fraud. Id.

It is undisputed that Rule 9(b)'s heightened pleading requirement applies not only to fraud claims, but to claims that are "grounded in fraud[.]" Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC, 781 F.3d 1003, 1010 (8th Cir. 2015). The Eighth Circuit has recognized that "[a]t least some of our sister circuits also apply Rule 9(b) to 'associated claims where the core allegations effectively charge fraud.'" Id. at 1010-1011 (citing N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 & n. 4 (1st Cir. 2009) (negligent misrepresentation and breach of fiduciary duty claims); and Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003) ("[I]n cases in which fraud is not an essential element of the claim, Rule 9(b) applies, but only to particular averments of fraud.")).  As the Ninth Circuit has explained:

> [T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).

In re Daou Systems, Inc., 411 F.3d 1006, 1027 (9th Cir. 2005) (quoting Vess, 317 F.3d at 1103–04).  However, when "fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." Id. citing Vess, 317 F.3d at 1105). In that situation, "[a]llegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." Id.

This diversity case is governed by Missouri law. Giant Trading, Inc. v. International Fuel Technology, Inc., 4:09-cv-778, 2010 WL 11706627, at *3 (E.D. Mo. May 4, 2010) citing Kunferman v. Ford Motor Co., 112 F.3d 962, 965 (8th Cir. 1997). "Under Missouri law, the elements of a claim of fraud are: (1) a false, material representation; (2) the speaker's knowledge of the falsity or his

13

ignorance of the truth; (3) the speaker's intent that the hearer act upon the representation in a manner reasonably contemplated; (4) the hearer's ignorance of the representation; (5) the hearer's reliance on the truth of the representation; (6) the hearer's right to rely thereon; and (7) the hearer's consequent and proximately caused injury." Id., 2010 WL 11706627 (quoting Kempton v. Dugan, 224 S.W.3d 83, 87 (Mo. App. 2007)).

After reviewing the first amended counterclaim, the Court concludes that Altmann's derivative breach of fiduciary claim is grounded in fraud. The central premise of this claim is that Wolf made numerous false, material misrepresentations to precipitate the formation of Botannis, only to subsequently breach his fiduciary duties to the corporation and its shareholders by holding the corporation hostage in an attempt to coerce Altmann to relinquish control over the corporation. Specifically, the amended counterclaim includes the general allegation that "[i]t was always Wolf's intention to condition all of his promises to [Altmann] on [Altmann's] execution of the Option Agreement" and that Wolf either deliberately or negligently failed to disclose this requirement to Altmann. [ECF No. 35 at ¶ 76] Thus, Altmann's claim is that Wolf engaged in a fraudulent course of conduct, which included the breach of his fiduciary duties, in order to effectuate his plan. Because Altmann's derivative breach of fiduciary duty claim is grounded in fraud, the allegations supporting this claim must meet the heightened pleading requirement of Rule 9(b).

The Court finds that Altmann has met the Rule 9(b) heightened pleading requirement. Specifically, Altmann asserts that on July 20, 2019, Wolf agreed to provide Botannis with $1,000,000 in funding to implement the business, and to provide the knowledge and equipment necessary to conduct the corporation's business. Altmann alleges that Wolf did not state that his funding commitment was "speculative or contingent on any future event provided that Botannis obtained a testing license[,]" or that he would seek "complete control" of Botannis through future amendment of the corporate bylaws or Altmann's execution of the option agreement. Altmann claims Wolf refused to act on Botannis' behalf and instead refused to carry out his director duties or

14

"perform any of his promises or representations[,]" until Altmann executed the amended bylaws and option agreement that were personally beneficial to Wolf, and that Wolf diverted the promised funding and testing equipment to Wolf's other operations. Altmann contends that Wolf failed to either disclose his desire to exercise sole control of Botannis prior to its formation or that Wolf's promises and representations were contingent upon his obtaining sole control of Botannis. Altmann asserts that Wolf either knew his representations were false when he made them or that Wolf negligently failed to disclose that he would only fulfill his obligations as director if Altmann signed the option agreement. Further, Altmann alleges that Wolf intended for Altmann to act on his representations, that Altmann did rely upon them, and that Botannis was damaged as a result of this reliance.

Based on the factual allegations contained in the first amended counterclaim, the Court finds Altmann has sufficiently alleged the time, place, and contents of the alleged false representations, the identity of the person making the misrepresentation, and what was obtained or given up thereby. Thus, the Court denies Wolf's motion to dismiss Altmann's derivative breach-of-fiduciary claim pursuant to Rule 9(b).

b.   Rule 23.1's Requirements for Derivative Actions/Altmann's
       Derivative Breach of Fiduciary Duty Claim (Count I)

Wolf argues Altmann's derivative breach-of-fiduciary-duty claim fails because Altmann has not satisfied Rule 23.1's requirement that the plaintiff fairly and adequately represent the interests of similarly situated shareholders when enforcing the rights of the corporation. Specifically, Wolf asserts that (1) Altmann's interests are antagonistic to the other shareholders because any award for damages would be paid by Wolf, a minority shareholder; (2) Altmann has no support from any of the minority shareholders; and (3) Altmann has demonstrated vindictiveness toward Wolf by "threaten[ing] Wolf with ill-conceived litigation" rather than "agree[ing] to [the option agreement] and appreciat[ing] a potential lucrative return from a minimal contribution[.]" [ECF No. 44, 18-19]

15

Altmann contends his interests are not antagonistic to the other shareholders because (1) he is seeking damages on behalf of Botannis; (2) Wolf fails to provide any support for his assertion that the other minority shareholders do not support the action; and (3) the threat of a lawsuit alone does not demonstrate vindictiveness.

"A derivative action is a suit by the corporation conducted by the shareholders as the corporation's representative. The shareholder is only a nominal plaintiff, and the corporation is the real party in interest." Nickell v. Shanahan, 439 S.W.3d 223, 227 (Mo. 2014) (quoting Goldstein v. Studley, 452 S.W.2d 75, 78 (Mo. 1970) (citations omitted)). Derivative actions are intended to compensate injuries to the corporation and the shareholders collectively, and not the shareholders individually. Id.

Federal Rule of Civil Procedure 23.1 governs derivative actions brought by one or more shareholders of a corporation to enforce a right that the corporation may properly assert but has failed to enforce. Fed. R. Civ. P. 23.1(a). The Rule provides the "action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders…who are similarly situated in enforcing the right of the corporation[.]"[10] Id. "An adequate representative must have the capacity to vigorously and conscientiously prosecute a derivative suit and be free from economic interests that are antagonistic to the interests of the class." Larson v. Dumke, 900 F.2d 1363, 1367 (9th Cir. 1990). Factors pertinent to the determination of adequacy of representation include:

> (1) indications that the plaintiff is not the true party in interest; (2) the plaintiff's unfamiliarity with the litigation and unwillingness to learn about the suit; (3) the degree of control exercised by the attorneys over the litigation; (4) the degree of support received by the plaintiff from other shareholders; ... (5) the lack of any personal commitment to the action on the part of the representative plaintiff"; Rothenberg v. Security Management Co., 667 F.2d 958, 961 (11th Cir.1982) (citations omitted), (6) the remedy sought by plaintiff in the derivative action; (7) the

---

[10] Subsection (b) of the rule includes heightened pleading requirements which have not been raised in this case.

16

relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; and (8) plaintiff's vindictiveness toward the defendants. <u>Davis v. Comed, Inc.</u>, 619 F.2d 588, 593–94 (6th Cir.1980).

<u>Id.</u>

These factors are interrelated and "it is frequently a combination of factors which leads a court to conclude that the plaintiff does not fulfill the requirements of [Rule] 23.1." <u>Id.</u> (quoting at <u>Davis</u>, 619 F.2d at 593). The party challenging the adequacy of the representation has the burden of demonstrating the shareholder's inadequacy. <u>Torchmark Corp. v. Bixby</u>, No. 88-4534-CV-W-5, 708 F. Supp. 1070, 1076–77 (W.D. Mo. Dec. 21, 1988).

Here, there is no evidence or argument before the Court as to many of these factors. Wolf only argues that Altmann is not an adequate representative because Altmann's economic interests are antagonistic to Wolf, that Altmann lacks support from the other shareholders, and that Altmann has demonstrated vindictiveness toward Wolf by threatening litigation. The Court finds Wolf's arguments to be unavailing.

As to economic antagonism, Wolf asserts that Altmann's shareholder suit is antagonistic to Wolf's economic interests as a minority shareholder because Wolf would be personally liable for any award of damages. This argument misconstrues the nature of the proceeding and the damages sought. In the derivative action, Altmann is seeking damages on behalf of the corporation and its shareholders, not individually. Thus, Altmann's economic interest as the representative shareholder is aligned with Botannis and the other shareholders, which is what Rule 23.1 requires. See Fed. R. Civ. P. 23.1 (a) (providing the "action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders…who are similarly situated in enforcing the right of the corporation[.]").

Wolf further contends the remaining minority shareholders do not support Altmann's derivative action and are "aligned with Wolf" because they "are social acquaintances or colleagues of Wolf[,]" and have not joined the litigation.  [ECF Nos. 44 & 52] Citing to several cases, Wolf contends a plaintiff cannot support the adequacy requirement when the plaintiff "has no support at all" from the other shareholders. [ECF No. 44, at pg. 18.]  In the cases cited by Wolf, however, the record clearly demonstrated that the remaining shareholders did not support the derivative suit. See Kuzmickey v. Dunmore Corp., 420 F. Supp. 226, 230-31 (D.C. Pa. 1976) (the remaining shareholders submitted affidavits contending the plaintiff did not represent their interests); Elgohary on behalf of Texas Halo Fund I, LLC v. Steakley, 2017 WL 5514373, at *7 (S.D. Tex. 2017) (remaining members expressed overwhelming support of the defendants and the plaintiff admitted to not being "able to rouse backing for litigating" the claim); and Smith v. Ayres, 977 F.2d 946, 948 (5th Cir. 1992) (plaintiff with 1/10,000,000 of an interest in the corporation received no cooperation from the remaining shareholders, who "vigorously deny the essential allegations that form the basis for [the] suit[.]"). Nothing in the record supports a finding that the remaining shareholders do not support Altmann's derivative action and Wolf has not presented the Court with any authority suggesting a lack of support can be inferred simply because the other minority shareholders have not joined the suit and they are friends or colleagues of a defendant.  The Court finds Wolf has failed to demonstrate that Altmann lacks support from other shareholder such that he should be disqualified from acting as the corporation's representative in a derivative action.

The Court is also unconvinced by Wolf's contention that Altmann has demonstrated vindictiveness toward Wolf  by "threaten[ing] Wolf with ill-conceived litigation" rather than "agree[ing] to [the option agreement] and appreciate[ing] a potential lucrative return from a minimal contribution[.]" The Court concludes that filing a lawsuit or threatening to file a lawsuit alone is not

tantamount to acting with "vindictiveness" and Wolf has presented the Court with no authority supporting such a finding.  Based on an evaluation of the relevant factors, the Court finds Wolf has failed to demonstrate that Altmann is not an adequate representative capable of bringing a derivative action on Botannis' behalf under Rule 23.1, and the Court denies Wolf's motion to dismiss on this basis.

        c.  <u>Failure to State a Claim under Rule 12(b)/Altmann's Derivative Breach of Fiduciary Duty Claim (Count I)</u>

To establish a claim for breach of fiduciary duty, a plaintiff must establish that a fiduciary duty exists between it and the defending party, the defending party breached the duty, and that the breach caused the proponent to suffer harm. <u>Zakiba v. Ahrens & McCarron, Inc.</u>, 28 S.W.3d 373, 381 (Mo. App. 2000). "Corporate officer and directors 'occupy a fiduciary relation to the corporation and to the stockholders; [t]heir position is one of trust and they are bound to act with fidelity and subordinate their personal interest to the interest of the corporation should there be a conflict.'" <u>Id.</u> at 382.  "An officer or director has a fiduciary duty to protect the corporation's interests." <u>Id.</u>

Wolf challenges whether Altmann established breach, causation, and damages. With regard to breach, Wolf argues (1) he never represented that he would unconditionally fund Botannis; (2) the parties were entitled to negotiate different business arrangements over the course of the venture; (3) Wolf was not required to fund Botannis or perform work on its behalf when "the parties disagreed on the key terms governing the business relationship[;]" and (4) Wolf's decision not to appeal or contest the revocation of Botannis' license is protected by the business-judgment rule.  Altmann counters that his allegations of breach, accepted as true, are sufficient to state a claim because they demonstrate that Wolf repeatedly advanced his own interests to the detriment of Botannis' interests. Altmann argues that the issue of whether Wolf breached his duty is a question of fact that should not be resolved on a motion to dismiss.

Here, Wolf's arguments that Altmann has failed to establish a breach hinge on factual disputes, including Wolf's motivations for his alleged acts and omissions. In considering the motion to dismiss, however, the Court must accept Altmann's factual allegations as true and draw all reasonable inference in his favor. See Cole, 599 F.3d at 861.

The same can be said of Wolf's assertions that Altmann failed to sufficiently plead causation and damages. Wolf argues that Altmann presented only conclusory allegations as to how Wolf's alleged breaches proximately caused "future lost profits and opportunities." Specifically, Wolf argues that Altmann's attempt to recover damages for future lost profits of a start-up business amounts to "pure conjecture" and cannot support a showing of causation or a claim for damages. Altmann counters that, just like breach, causation is a question of fact, and that he sufficiently pled causation by alleging that "Wolf's actions and omissions effectively destroyed Botannis because a cannabis testing company cannot operate without a license[.]" Furthermore, Altmann contends he alleged sufficient facts showing Botannis suffered harm in that Wolf's actions and omissions resulted "in lost profits and business opportunities due to the loss of the testing license that was essential to Botannis' continued operation." Altmann also opposes Wolf's assertion that a new business cannot maintain a claim for lost profits.

"Under Missouri law, as a general rule, anticipated profits of a commercial business are too remote and speculative to warrant their recovery." Independent Business Forms, Inc. v. A-M Graphics, Inc., 127 F.3d 698, 703 (8th Cir. 1997) (citing Coonis v. Rogers, 429 S.W.2d 709, 714 (Mo. 1968) (quotations omitted).  Anticipated profits, however, may be recovered when "they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." Id. (quoting Coonis, 429 S.W.2d at 714; Anderson v. Abernathy, 339 S.W.2d 817, 824 (Mo. 1960)). Generally, the "plaintiff must produce proof of the business' income and expenses during a reasonable period of time prior to the interruption of the business." Id. (quoting Coonis, 429 S.W.2d at 714; Polytech, Inc. v. Affiliated FM Ins. Co., 21 F.3d 271, 276 (8th Cir.1994)). While the

20

requirement that expected profits must be proven with reasonable certainty places a burden on newly established businesses,  a new business can still recover lost profits. Id.  "[U]nder Missouri law there is no per se rule that a so-called 'new' business may not, regardless of the facts and circumstances, recover for loss of net profits or net gain." Id. (quoting Handi Caddy, Inc. v. American Home Products Corp., 557 F.2d 136, 139 (8th Cir.1977)).

While it may be difficult for Altmann to prove Botannis suffered lost profits, this category of damages is not barred from recovery if Altmann supports the claim with sufficient proof at trial. Because Altmann's claim for damages is dependent on the evidence presented in support, it is improper to dismiss Altmann's claim on this basis at this stage of the litigation. The Court finds that Altmann's allegations that Botannis was directly and proximately damaged by Wolf's actions and omissions "in the form of future lost profits and opportunities" is sufficient to withstand Wolf's motion to dismiss.

Based on the foregoing, the Court finds the first amended counterclaim contains sufficient factual matter to state a derivative breach-of-fiduciary-duty claim. Wolf's motion to dismiss Altmann's derivative breach-of-fiduciary duty claim pursuant to Rule 12(b)(6) is denied.

3.   Altmann's Individual Claims for Breach of Fiduciary Duty, Fraud, and Negligent Misrepresentation

In addition to Botannis' and Altmann's derivative breach-of-fiduciary-duty claims in Count I, the first amended counterclaim includes three claims brought by Altmann individually: (1) a direct claim for breach of fiduciary duty in Count I; (2) fraud in Count II; and (3) negligent misrepresentation in Count III. [ECF No. 35]

Wolf does not specifically address Altmann's individual breach-of-fiduciary-duty claim in the motion to dismiss other than to assert that the "claim must be brought derivatively" under Missouri law. [ECF No. 44, at 16-17]  Altmann's only response on this issue is to assert that a "shareholder may sue individually if there is an individual injury separate from any injury the

21

stockholder sustains." [ECF No. 49, at 3] Wolf moves to dismiss Altmann's claims for fraud and negligent misrepresentation arguing Altmann failed to meet the heightened pleading requirement of Rule 9(b) and to state a claim for which relief can be granted under Rule 12(b). [ECF No. 44]. With regard to Rule 12(b), Wolf asserts Altmann failed to establish multiple elements of the fraud and negligent misrepresentation claims, including that the alleged false representations "proximately caused him injury" because any contention that Botannis lost out on future profits is too attenuated to support the claims. [ECF No. 44, at pgs. 15 & 25] Altmann opposes Wolf's motion asserting he sufficiently pled his claims for fraud and negligent misrepresentation. [ECF No. 49]

Irrespective of the validity of many of the issues raised by Wolf's motion, the Court concludes that Altmann's individual claims for relief implicate standing and jurisdiction.[11] In support of his individual claims for breach of fiduciary duty, fraud, and negligent misrepresentation, Altmann alleges his injuries are the diminution of the value of his stock in Botannis and his proportional interest as a stockholder in Botannis' future lost profits. However, these are indirect, derivative injuries and Altmann does not allege an individual injury separate from his injuries as a stockholder of Botannis.

Count I includes an individual or direct claim of breach of fiduciary duty by Altmann against Wolf as director of Botannis. [ECF No. 35, ¶ 95-97, 102] With respect to damages, Altmann alleges that: (1) "[b]oth [Altmann] and Botannis have been damaged as a direct and proximate result of Wolf's actions, error, and omissions in the form of future lost profits and opportunities and attorney's fees" and (2) that the anticipated future lost profits "would have been paid to Botannis" and that Altmann "personally has a proportional interest in these sums which could have been distributed to him as a shareholder of Botannis."  [ECF No. 35 , ¶¶ 95-97]

---

[11] Although the parties have not raised the issue of standing or the Court's jurisdiction, the Court has an independent obligation to examine its jurisdiction to act. International Ass'n of Fire Fighters, Local 2665 v. City of Clayton, 320 F.3d 849, 850 (8th Cir. 2003).

When a plaintiff-shareholder alleges that the director of a corporation has breached its fiduciary duty, resulting in injury to the shareholders, the shareholder is generally required to bring the action derivatively. Nickell, 439 S.W.3d at 227. "Shareholders cannot in their own right and for their own personal use and benefit maintain an action for the recovery of corporate funds or property improperly diverted or appropriated by the corporation's officers and directors." Id. (quoting Centerre Bank of Kansas City, Nat. Ass'n  v. Angle,  976 S.W.2d 608, 613 (Mo. App. 1998). This is because the injury is not to the shareholders individually, but to the corporation and to the shareholders collectively. Id.

Individual actions are permitted only when the injury is to the individual shareholder directly and not to the corporation. Id. Examples of individual injuries include denying a shareholder the right to inspect corporate books and records or removal of the shareholder as the controlling shareholder. Id.  "[D]iminished corporate value is a corporate injury." Id. at 229. Thus, damage in the form of decreased share price does not support a direct shareholder claim because the damage is common to every shareholder and stems from the underlying corporate injury. Id. Likewise, lost profits or reduced revenue are corporate injuries and cannot serve as a basis for a shareholder's direct claim.  Duff v. Otto Hohner GbR, No. 07-00751-CV-W-JTM, 2010 WL 11509207, at *2-4 (W.D. Mo. Feb. 2, 2010) (shareholder alleging reduced or lost revenue cannot maintain a direct claim for breach of fiduciary duty based on "damages to profitability" of a closely held corporation).

While Altmann acknowledges the legal principle that a shareholder must have "an individual injury separate from any injury the stockholder sustains" to maintain a direct action against a corporate director, Altmann does not allege an individual injury separate from his injury as a stockholder in Count I of the first amended counterclaim.  The only injury Altmann alleges with respect to Wolf's alleged breach of fiduciary duty is "future lost profits and opportunities and attorney's fees[.]" Specifically, Altmann alleges he "personally had a proportional interest" in Botannis' future lost profits "which could have been distributed to him as a shareholder of Botannis."

23

[ECF No. 35 , ¶¶ 95-97]  While couched in terms of a "personal" injury, Altmann's claim is common to all of the shareholders and directly stems from the underlying corporate injury. Thus, Altmann's alleged injury is a corporate injury, rather than an individual injury, and consequently actionable only through a derivative action.

The failure to raise a direct, nonderivative injury pervades Altmann's fraud and negligent misrepresentation claims as well. In Counts II and III of the first amended counterclaim, Altmann brings claim of fraud and negligent misrepresentation against Wolf based on allegations that between June 2019 and February 2020, Wolf, orally and in writing, made the following representations to Altmann:

> (a) that [Wolf] would work cooperatively with [Altmann] within Botannis going forward, (b) that [Wolf] would commit at least $1 million dollars to Botannis, (c) that [Wolf] would dedicate equipment to Botannis, (d) that [Wolf] would honor all of the representations he made to Missouri in the license application, and (e) that [Wolf] intended to comply with the [agreed to August 2019 bylaws].

[ECF No. 35, ¶¶ 109-130]

In support of his claim for fraud, Altmann alleges Wolf knew these representations were false and that Wolf never intended to follow through on his representations and promises. Specifically, Altmann asserts Wolf "never had an intention to follow through and honor [] any of his obligations articulated in [the corporate bylaws.]" [ECF No. 35, ¶¶ 111, 112] Altmann alleges he was unaware of the falsity of Wolf's representations and that Altmann had a right to rely on, and did rely on, Wolf's representations. [ECF No. 35, ¶¶ 111] Altmann asserts Wolf intended for Altmann to act on the representations so that Altmann would "be the Missouri resident who would enable Wolf to own a Missouri marijuana license" and that Wolf's representations were material to Altmann's "decision to be a part of Botannis." [ECF No. 35, ¶¶ 113, 115] With respect to damages, Altmann alleges he suffered damages in excess of $25,000 "as a direct and proximate cause of Wolf's errors, omissions

24

and misconduct[.]"

In support of his negligent misrepresentation claim, Altmann alleges Wolf made these representations in the course of his business "as the parties agreed on a division of labor and expense. " [ECF No. 35, ¶ 123] Altmann maintains Wolf knew Altmann needed this information before he would agree to invest any time or expense toward Botannis and that Wolf provided these representations "for the guidance of [Altmann] in their business transaction." [ECF No. 35, ¶¶ 126-127] Altmann alleges that, due to Wolf's failure to exercise reasonable care, these representations were false in that "Wolf deliberately or negligently failed to disclose that Wolf would only fulfill" his obligations if Altmann executed the option agreement. [ECF No. 35, ¶ 125] Altmann asserts he justifiably relied on Wolf's representations and, as a result, was damaged as a direct and proximate cause of Wolf's errors, omissions, and misconduct. [ECF No. 35 ¶ 128, 130] Altmann specifically alleges "he suffered a pecuniary loss in that Wolf pulled the rug out from underneath him after all of the groundwork had been laid – with the exception of Wolf's obligations[.]" [ECF No. 35, ¶ 129]

At the outset, the Court notes that it is difficult to pinpoint Altmann's alleged damages based on the specific allegations contained in Counts II and III.  The general tenor of Altmann's claims are that Wolf's representations induced Altmann to join the business venture and Altmann was subsequently damaged when Wolf refused to make good on his promises to provide funds and equipment to Botannis or to do work on its behalf after Altmann declined to amend the parties' deal. Altmann, however, does not specify what his damages are under Counts II and III.[12]

---

[12]  Altmann alleges in Count III that, in reliance on Wolf's representations, he "[a]s alleged…with the assistance of his brother expended time towards procuring the license, ensuring compliance and obtaining clients based on the [information provided by Wolf]."  [ECF No. 35, ¶¶ 124, 128] This appears to be an allegation that Altmann was damaged because he "expended" time in connection with the formation of the business venture which ultimately yielded no return due to Wolf's failure to fulfill his promises.

While the counterclaim includes a general allegation that the license application process was "extensive[,]" it also alleges that "Jeffrey, on behalf of [Altmann], agreed to be responsible for obtaining the

In his memorandum in opposition to Wolf's motion to dismiss the amended counterclaim, Altmann clarifies his claims and asserts he "was harmed in that his shares in Botannis are now worthless insofar as it is a cannabis testing facility that is not legally permitted to test cannabis and as a result, lost out on millions in gross profit." [ECF No. 49, pgs. 13 & 15] In support of his theory of damages on Counts II and III, Altmann references his allegations of damages for future lost profits contained in Count I of the amended counterclaim. [ECF No. 49 pgs. 13 & 15 which includes citations to ¶¶ 96-97 of the first amended complaint alleging the gross profits forecasted were future lost profits in which Altmann had "a proportional interest" as a shareholder.]  Assuming *arguendo* that Counts II and III of the amended counterclaim allege that Wolf's fraudulent and/or negligent misrepresentations caused damage by diminishing the value of Botannis' stock and causing Botannis to lose "out on millions in gross profit," Altmann has failed to allege that *he* sustained a cognizable injury.  As already discussed, diminished share value and lost profits are corporate injuries, not personal injuries to individual stockholders.  Thus, Counts II and III of the first amended counterclaim fail to state to claim upon which relief can be granted because Altmann does not allege that he suffered any direct, nonderivative injury.

While it is clear that Altmann's failure to assert a direct, nonderivative injury is problematic, there is considerable debate about the proper characterization of this issue.[13] Conflicting authorities suggest that a plaintiff's attempt to recover for another's injury ranges from a failure to state a claim

---

license, ensuring compliance with state law and regulations, and procuring clients[.]" [ECF No. 35, ¶¶ 35, 38] Based on the allegations in the amended counterclaim, it was Jeffrey, not Altmann, who "expended time towards procuring the license, ensuring compliance and obtaining clients[.]" Thus, the factual allegations in the first amended counterclaim do not support a finding that Altmann was personally damaged by expending time in connection with the formation of the failed business venture.

[13] 13A Fed. Prac. & Proc. Juris. § 3531 (Wright & Miller) (3d ed.) (compiling cases and discussing confusion of the concepts of constitutional or Article III standing, prudential standing, the real-party-in-interest doctrine, capacity, and the failure to state a claim).

to a lack of standing.[14] Among those authorities that characterize this as a standing issue, disagreement and confusion abound on whether it impacts the Court's jurisdiction to hear the case.[15]

"A plaintiff must establish subject matter jurisdiction, for which standing is a prerequisite." Jewell v. U.S., 548 F.3d 1168, 1172 (8th Cir. 2008). Standing has two related components: "the constitutional requirements of Article III and nonconstitutional prudential considerations." Franchise Tax Bd. of California v. Alcan Aluminum Ltd., 493 U.S. 331, 335 (1990). Constitutional standing consists of three elements: (1) the party must have suffered an injury in fact, meaning an actual or imminent concrete and particularized injury to a legally protected interest; (2) the injury is

---

[14] Culverhouse v. Paulson & Co. Inc., 813 F. 991, 993-94 (11th Cir. 2016) (holding an investor's suit claiming diminution of value of a limited liability company must be brought derivatively, not directly, however dismissal of the complaint should be for failure to state a claim not for lack of subject matter jurisdiction); Potter v. Cozen & O'Connor, 46 F.4th 148, 155, 157 (3rd Cir. 2022) (third-party standing, including shareholder standing, is a non-jurisdictional prudential limitation implicating the merits and the plaintiff's power to bring the claim, and should be considered under Rule 12(b)(6) and not Rule 12(b)(1)); Crocker v. Federal Deposit Ins. Corp., 826 F.2d 347 (5th Cir. 1987) (remanding and ordering the district court to dismiss the shareholders' complaint under Rule 12(b)(6) for lack of standing because the shareholders did not allege suffering any direct, nonderivative injuries); Baker v. Arkansas Blue Cross and Blue Shield, CV 08-3974 SBA, 2009 WL 10654078 (N.D. CA July 31, 2009) (dismissing some of the shareholders' claims for lack of jurisdiction under Rule 12(b)(1) because shareholders did not have standing); Potthoff v. Morin, 245 F.3d 710 (8th Cir. 2001) (stockholder who did not allege a direct, nonderivative injury does not have standing to sue under Article III); International Ass'n of Fire Fighters, Local 2665 v. City of Clayton, 320 F. 3d 849 (8th Cir. 2003) (dismissing complaint for lack of jurisdiction, finding plaintiffs did not have standing to bring a direct, nonderivative action); Sinclair v. Hawke, 314 F.3d 934, 937, 939, 944 (8th Cir. 2003) (holding shareholder's complaint failed to state a claim because shareholder's "pleading was defective for failing to allege [his] constitutional and prudential standing to assert [the] claims.")

[15] See Potter v. Cozen & O'Connor, 46 F.4th 148, 155 (3rd Cir. 2022) (citing cases from the Second, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits with conflicting holdings on whether the third-party standing doctrine implicates the court's jurisdiction under Article III).

In Franchise Tax Bd. Of California, 493 U.S. at 335-38, the U.S. Supreme Court did not specifically state whether the prudential requirements of standing implicate the Court's jurisdiction. However, after the Court concluded that the plaintiffs had Article III standing, the Court declined to answer the question of whether the plaintiff-stockholders had prudential standing but instead found the plaintiffs' action was barred under the statute. Id. at 338 This suggests that the Court does not view prudential requirements as implicating the Court's jurisdiction to hear a case. But cf. United States v. Sineneng-Smith, 140 S. Ct. 1575, 1586-87 (2020) (Thomas, J. concurring) (acknowledging that "the modern Court has characterized the [third-party standing] rule as a prudential rather than jurisdictional matter," and arguing that this is inconsistent with the "historical understanding of Article III.")

fairly traceable to the challenged action of the defendant; and (3) the plaintiff's injury must be redressable by a favorable decision. <u>Jewell</u>, 548 F.3d at 1172. In addition to the constitutional requirements, there are prudential limits to the court's exercise of jurisdiction. <u>Id.</u> One of the prudential requirements of the standing doctrine is that a litigant "generally must asserts his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" <u>Franchise Tax Bd. of California</u>, 493 U.S. at 336 (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975). With regard to this prudential requirement, the U.S. Supreme Court has stated: "[r]elated to this principle we think is the so-called shareholder standing rule." <u>Franchise Tax Bd. of California</u>, 493 U.S. at 336 (quoting <u>Warth</u>, 422 U.S. at 499).

As previously touched upon, a corporation is a separate and distinct entity from its stockholders. <u>Potthoff v. Morin</u>, 245 F.3d 710, 716 (8th Cir. 2001). The "shareholder standing rule" provides that "[a]ctions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name ... even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." <u>Id.</u> (quoting <u>Brictson v. Woodrough</u>, 164 F.2d 107, 109 (8th Cir.1947) (footnotes omitted)). See also <u>Duff</u>, 2010 WL 11509207, at *4 (lost profits and reduced revenue are corporate injuries and cannot serve as a basis for a shareholder's direct claim). Thus, as a general rule, "if a harm has been directed toward the corporation, then only the corporation has standing to assert a claim." <u>Id.</u> A stockholder's claim can survive only if he alleges "that he personally has suffered a direct, nonderivative injury." <u>Potthoff</u>, 245 F.3d at 717. See <u>Franchise Tax Bd. of California</u>, 493 U.S. at 336.

The Eighth Circuit's precedent addressing third-party standing, specifically shareholder standing, is inconsistent. The Eighth Circuit has alternatively identified this issue as a failure to state a claim, prudential standing, constitutional standing, and a mixture of these doctrines.

In Potthoff, 245 F.3d at 716-18, the Eighth Circuit affirmed the district court's dismissal of a shareholder's complaint, holding that a shareholder lacks "standing to sue under Article III" when he does not have a cognizable injury that is distinct from the harm suffered by the corporation.[16] Two years later, in Sinclair v. Hawke, 314 F.3d 934, 937, 939, 944 (8th Cir. 2003), the court charted a slightly different course and concluded that the plaintiff-shareholder's complaint failed to state a claim upon which relief could be granted because the plaintiff failed "to allege [his] constitutional and prudential standing to assert" claims for adverse actions taken against the corporation when the plaintiff's only financial injury was to the value of his investments. The court found the plaintiff-shareholder's claim fell within the "prudential standing rule" barring litigants from asserting the rights and interests of others and that his "indirect monetary loss simply does not give him constitutional or statutory standing to sue[.]" Id. at 939.

The following month, in International Ass'n of Fire Fighters, Local 2665, 320 F.3d at 850, the court held that third-party standing was not a question of whether the plaintiff's complaint stated a claim for relief but was a matter of standing implicating the court's jurisdiction. The court observed that standing to challenge a statute or ordinance "is present when the challenger has experienced a direct injury or will soon sustain a direct injury redressable by the court," and that a plaintiff does not have standing, and correspondingly the court is without jurisdiction, when "a plaintiff has not suffered an injury[.]" Id. The court concluded that the plaintiffs, as beneficiaries of the subject pension plan, could have brought a derivative suit on behalf of the plan or its trustees, they did not

---

[16] Although in Potthoff, the Eighth Circuit discussed constitutional standing under Article III and "the prudential limits of the standing doctrine" separately, it is unclear from the opinion which doctrine the court relied upon in making its determination. Id. at 715-718. While the court's ultimate finding of lack of standing under Article III suggests the court believed the plaintiff lacked "constitutional standing" in the traditional sense of the phrase, it is possible that the court believed a lack of "prudential standing" implicated the court's jurisdiction.

have standing to bring the present "action for damages because only the pension plan, if anyone, has possibly suffered actionable injury." Id. at 851.  The court remanded the action to the district court "for dismissal for lack of jurisdiction." Id.

More recently, the Eighth Circuit has taken the position that shareholder standing is a question of prudential standing, without touching on the question of its jurisdictional effect. In Jewell, 548 F.3d at 1172-73, the Eighth Circuit concluded the plaintiff, a shareholder in a dissolved law firm, did not have prudential standing to sue the IRS because the law firm, and not plaintiff, was the taxpayer from whom the disputed tax was collected. Id. at 1172-73. The court held that, "even assuming that the IRS caused Jewell to be injured in a legally cognizable way," he could not maintain the action because "the injury [he] suffered is indistinguishable from the injury suffered by [the law firm] as an organization." Id. at 1173. The court specifically rejected the position that "personal financial loss alone" should "become the touchstone for shareholder standing." Id.  While the Jewell court found that shareholder standing was a prudential requirement, it did not state that its absence was a jurisdictional deficiency. Id.

In light of this precedent, it is clear that Altmann's individual claims as stated in the first amended counterclaim are deficient. At a minimum, the first amended counterclaim fails to state a claim with regard to Altmann's individual claims for breach of fiduciary duty, fraud, and negligent misrepresentation because Altmann fails to alleged that he suffered a direct, nonderivative injury. Eighth Circuit precedent further supports a finding that Altmann lacks prudential standing to sue and, potentially, that the Court's lacks jurisdiction under Article III to entertain these claims.

Based on the foregoing, the Court dismisses Altmann's individual claim for breach of fiduciary duty in Count I, Altmann's claim for fraud under Count II,  and Altmann's claim for negligent misrepresentation under Count III. Because the Court has raised these issues *sua sponte*,

Altmann's claims are dismissed without prejudice so that he may have the opportunity to replead his counterclaims to cure any deficiencies. See Potter, 46 F. 4th 148 (remanding to the district court with directions to for the court to consider the merits of plaintiff's motion to amend the pleading after finding the shareholder standing rule is a prudential rule and not a constitutional or jurisdictional one). The Court grants Altmann 14 days to file an amended counterclaim.

C.  Motion to Stay Discovery

Wolf also filed a motion to stay written discovery sought by Altmann requesting the Court stay discovery until it has fully adjudicated: (1) Wolf's motion to dismiss the First Amended Counterclaim, and (2) any subsequent motions to dismiss amended counterclaims, if the Court permits Altmann leave to further amend.[17] [ECF No. 37] Wolf does not object to "permissible discovery requests that are tied to his Complaint" but "maintains that there is little reason to engage in extensive and burdensome discovery (particularly, voluminous document production) based on counterclaims that should be dismissed." [ECF No 38, page 1] Alternatively, in the event the Court denies the motion to stay, Wolf requests the Court provide him with 30 days to provide amended and supplemental responses and objections to Altmann's written discovery requests. [ECF No. 37]

In light of the Court's ruling on Altmann's counterclaims, including the Court's denial of Wolf's motion to dismiss Altmann's derivative breach-of-fiduciary-duty claim in Count I, the Court denies Wolf's request for a stay of discovery as moot but grants his request for an additional 30 days to provided amended and supplemental responses and objections to Altmann's written discovery requests.

IV.  **Conclusion**

After careful consideration,

---

[17] Wolf's motion to stay written discovery until adjudication of his motion to dismiss the first amended counterclaim was filed on August 24, 2022, nine days before he filed his motion to dismiss the first amended counterclaim on September 2, 2022. [ECF Nos. 37 & 43]

**IT IS HEREBY ORDERED** that Plaintiff/Counter-Defendant Matthew Wolf's Motion to Dismiss Defendant/Count-Claimant Danial Altmann's counterclaim [ECF No. 31]  is **DENIED as moot**.

**IT IS FURTHER ORDERED** that Wolf's Motion to Dismiss the First Amended Counterclaim [ECF No. 43] is **DENIED**.

**IT IS FURTHER ORDERED** that Altmann's individual claim for breach of fiduciary duty in Count I, and Counts II and III of the first amended counterclaim are **DISMISSED without prejudice**.  The Court grants Altmann 14 days to file an amended counterclaim.

**IT IS FINALLY ORDERED** that Wolf's motion to stay discovery pending adjudication of Altmann's counterclaims [ECF No. 37] is **GRANTED in part** and **DENIED in part**. The Court denies Wolf's request for a stay as moot but grants Wolf 30 days from the date of this order to provide amended and supplemental responses and objections to Altmann's written discovery requests.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of December, 2022